# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

---

No. 5:08-cv-389

---

LULAC OF TEXAS; MEXICAN AMERICAN BAR ASSOCIATION OF
HOUSTON, TEXAS (MABAH); ANGELA GARCIA; BERNARDO J. GARCIA;
ELVIRA RIOS; ROGER ROCHA; ROSARIO VERA; RAYMUNDO VELARDE

                                                        Plaintiffs

v.

TEXAS DEMOCRATIC PARTY

                                                        Defendant

---

Before PRADO, Circuit Judge, and BIERY and RODRIGUEZ, District Judges.
PRADO, Circuit Judge:

The Voting Rights Act of 1965 represents a watershed development in the civil rights movement toward equality in voting—and thus in achieving equality in our democratic order. Because the right to vote is "a fundamental matter in a free and democratic society" and "preservative of other basic civil and political rights," *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964), achieving racial equality in voting is paramount to the functioning of our democracy. As the Supreme Court recently noted, "[t]he historic accomplishments of the Voting Rights Act are undeniable." *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 129 S. Ct. 2504, 2511 (2009). Today, we continue to give force to those accomplishments by following clear Supreme Court precedent and ruling that Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, applies to a political party's delegate

allocation formula for its nominating convention. We therefore deny the Texas Democratic Party's ("the TDP" or "the Party") motion for summary judgment.

# I. Factual Background

Plaintiffs, several voter advocacy groups and voters,[1] filed suit against the TDP under the Voting Rights Act, challenging the way in which the TDP distributes and allocates delegates for participation in the Party's nominating conventions. Specifically, Plaintiffs contend that under Section 5 of the Voting Rights Act, the TDP must secure preapproval—or "preclearance"—from the Attorney General of the United States or the United States District Court for the District of Columbia for changes it makes to its delegate allocation formula. *See* 42 U.S.C. § 1973c.

Under its "Texas two-step" nomination system for the 2008 election, the TDP allocated approximately three-fourths of its delegates to the Democratic National Convention based on a presidential primary and the remaining one-fourth of the delegates based on the Party's state nominating convention. Plaintiffs challenge the manner in which the TDP decides the number of delegates each district may send to the state convention. In essence, the dispute boils down to whether the TDP should use the raw vote totals or the percentage of Democratic support in each district to allocate the delegates.

In 2008, the TDP allocated delegates to each precinct convention based on the raw votes cast in that precinct for the Democratic nominee for governor in 2006, Chris Bell ("Bell"). The precinct delegates then moved on to the County and Senatorial District conventions, and again, the TDP gave each district a proportional number of delegates based on the raw votes cast in that district for Bell in 2006. Ultimately, at the state convention, the TDP elected delegates

---

[1] Plaintiffs consist of LULAC (League of United Latin American Citizens) of Texas; the Mexican American Bar Association of Houston, Texas (MABAH); Angela Garcia; Bernardo J. Garcia; Elvira Rios; Roger Rocha; Rosario Vera; and Raymundo Velarde.

from the Senatorial District conventions—who represented their districts based on the raw vote totals for Bell in 2006—to attend the Democratic National Convention. Plaintiffs assert that this delegate allocation plan discriminates against Latino voters. They claim that Latino majority Senatorial districts that voted overwhelmingly for Bell in 2006 received fewer delegates than white majority districts that gave a smaller percentage of support to Bell. That is, the Latino majority districts were smaller in size than the white majority districts, so even though they may have supported Bell to a greater percentage, there were still more raw votes for Bell in the white majority districts. Therefore, the white majority districts received more delegates in 2008. Plaintiffs assert that the TDP should allocate delegates based on either the district's percentage support for the Democratic gubernatorial candidate or the proportion of the vote for all Democratic candidates, not the raw vote. This, Plaintiffs contend, would reward Democratic loyalty without "punishing" Latino voters for living in smaller districts, especially because they generated a greater amount of support for Bell within their districts.

Importantly, whether the TDP's delegate allocation plan actually discriminates against minority voters (i.e., whether it "has the purpose [or] will have the effect of denying or abridging the right to vote on account of race or color," 42 U.S.C. § 1973c(a)) is *not* at issue in this summary judgment motion. That is a question for the Attorney General or the D.C. District Court should we conclude that preclearance is required. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 216-17 (1996). Instead, we simply must determine whether the TDP must preclear its delegate selection formula because it has the *potential* for discrimination, not whether that formula actually violates the Voting Rights Act. *See id.* at 216 (noting that "the decision whether discrimination has occurred or was intended to occur . . . is for the Attorney General or the District Court for the District of Columbia to make in the first instance"); *see also City of Lockhart*

*v. United States*, 460 U.S. 125, 129 n.3 (1983) (explaining that the three-judge district court could only "determine (i) whether a change was covered by § 5, (ii) if the change was covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy was appropriate").

On appeal from this court's dismissal of Plaintiffs' complaint, the United States Court of Appeals for the Fifth Circuit affirmed the dismissal as to the State of Texas but reversed the dismissal as to the Party. *See LULAC v. Texas*, 318 F. App'x 261, 262 (5th Cir. 2009) (per curiam) (unpublished).[2] As both sides agree that the TDP did not preclear the manner in which it allocates its delegates for its nominating conventions, the court remanded for this three-judge district court to determine if Section 5 covers this practice, thereby requiring preclearance. *See id.* at 262-63. Specifically, the Fifth Circuit directed this panel to consider

> (1) whether the delegate-allocation method is a "'standard, practice, or procedure with respect to voting' within the meaning of § 5," *Dougherty County, Ga., Bd. of Educ. v. White*, 439 U.S. 32, 33-34 (1978); (2) whether the method constitutes a "change" to the covered jurisdiction's baseline, i.e., "the most recent practice that was both precleared and 'in force or effect'—or, absent any change since the jurisdiction's coverage date, the practice that was 'in force or effect' on that date," *Riley v. Kennedy*, 128 S. Ct. 1970, 1982 (2008) (internal citation omitted); and (3) whether the Party is a "political subdivision" subject to § 5, *Dougherty County*, 439 U.S. at 34.

*Id.* at 263.

The TDP filed a motion for summary judgment on only the third issue—whether the TDP falls under the coverage of Section 5 as a "political subdivision." As we explain below, Supreme Court precedent requires us to deny

---

[2] Judge Garza dissented from the affirmance of the district court's dismissal of the State. *See LULAC*, 318 F. App'x at 265 (Garza, J., concurring in part and dissenting in part).

the TDP's motion.

## II. Voting Rights Act

In relevant part, Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, provides as follows:

> (a) Whenever a [covered] State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. . . . Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court.

Section 5 has covered the entire state of Texas since 1975. *See* 40 Fed. Reg. 43,746 (Sept. 23, 1975). Therefore, if the TDP is considered a "political subdivision" of Texas, then the D.C. District Court or the Attorney General must preclear any changes that the TDP makes to "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c(a).

The Supreme Court has explained that Congress intended the Voting

Rights Act to have "the broadest possible scope." *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969). "The legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Id.* at 566. As the Court explained in rejecting the argument that Section 5 does not apply to a municipality that does not register voters,

> The language, structure, history, and purposes of the Act persuade us that § 5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions, not only to counties or to whatever units of state government perform the function of registering voters.

*United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 118 (1978).

Of course, Section 5 does not list "political party" as an entity subject to the preclearance requirement. Nevertheless, the Supreme Court, in *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), held that a state political party is tantamount to a "political subdivision" when the state gives authority to the party to promulgate rules that affect voting and therefore that the party was required to preclear a change in its nominating convention process. Accordingly, the resolution of this summary judgment motion turns largely on whether *Morse* applies to the facts of this case.

### III. *Morse v. Republican Party*

In 1994, the Republican Party of Virginia ("Republican Party") held a state convention to nominate the Republican candidate for United States Senator. *Id.* at 190. The Republican Party allowed any registered voter who would declare his or her support for the Republican Party's nominees and who would pay either a $35 or $45 registration fee (depending on the time of registration) to participate in the candidate selection process. *Id.* Several law students contended that the registration fee, as a condition precedent to participating in

the nomination process, constituted a prohibited poll tax. *Id.* The Court considered two issues: whether the Republican Party was required to obtain preclearance of the registration fee under Section 5, and whether the law students could challenge the fee as a poll tax under Section 10 of the Voting Rights Act. *Id.*

The Court issued a 5-4 decision in favor of the law students. The Court held that the Republican Party was "acting under authority explicitly or implicitly granted by" Virginia, a covered jurisdiction, meaning that any changes the Republican Party made that affected voting—such as the registration fee at issue—were subject to Section 5's preclearance requirement. *Id.* at 197-99, 219. The Court also concluded that Section 10 of the Voting Rights Act created a private right of action to challenge an unlawful poll tax. *Id.* at 233.

The Court's decision, however, was far from cohesive. The Court issued five separate opinions, which we detail below.

Justice Stevens (joined by Justice Ginsburg) wrote the controlling opinion. He framed the question as follows: "whether the coverage of § 5 encompasses the Party's voting qualifications and procedures when its nominees are chosen at a convention." *Id.* at 194. Justice Stevens relied upon an Attorney General regulation, the legislative history of the Voting Rights Act, and the history that led to the passage of the Act to conclude that it does.

The Attorney General regulation in question, 28 C.F.R. § 51.7, provides,

Certain activities of political parties are subject to the preclearance requirement of section 5. A change affecting voting effected by a political party is subject to the preclearance requirement: (a) If the change relates to a public electoral function of the party and (b) if the party is acting under authority explicitly or implicitly granted by a covered jurisdiction or political subunit subject to the preclearance requirement of section 5. For example, changes with respect to the recruitment of party members, the conduct of political campaigns, and the drafting of party platforms are not subject to the preclearance requirement. Changes with respect to the conduct of

primary elections at which party nominees, delegates to party conventions, or party officials are chosen are subject to the preclearance requirement of section 5. Where appropriate the term "jurisdiction" (but not "covered jurisdiction") includes political parties.

Justice Stevens noted that this regulation "unambiguously provides that when a political party makes a change affecting voting, § 5 requires preclearance if two conditions are satisfied: The change must relate to a 'public electoral function of the party' and the party must be 'acting under authority explicitly or implicitly granted by a covered jurisdiction.'" 517 U.S. at 194. The Republican Party conceded that its nominating convention related to a public electoral function of the Party. *Id.* at 195. Justice Stevens therefore turned to a lengthy discussion of whether the Party was "acting under authority explicitly or implicitly granted by a covered jurisdiction." *Id.*

Under Virginia law, a candidate could place his or her name on a general election ballot in one of two ways. *Id.* First, an independent candidate could submit a petition with a sufficient number of signatures of registered voters. *Id.* Second, the nominees of the two major political parties received automatic ballot access in the top two positions on the ballot. *Id.* at 195-96. Virginia law also authorized the two parties to determine for themselves how to select their nominees. *Id.* at 196. Justice Stevens found that this delegation of authority to select the nominee, coupled with automatic ballot placement, meant that the Republican Party was acting under the authority of the State when it conducted its nominating convention. *Id.* at 196-97. As Justice Stevens concluded, the two major political parties "are effectively granted the power to enact their own qualifications for placement of candidates on the ballot, which the Commonwealth [of Virginia] ratifies by adopting their nominees." *Id.* at 197. "Correspondingly," Justice Stevens stated, "when Virginia incorporates the Party's selection, it 'endorses, adopts, and enforces' the delegate qualifications

set by the Party for the right to choose that nominee." *Id.* at 198 (quoting *Smith v. Allwright*, 321 U.S. 649, 664 (1944)).

Justice Stevens bolstered his analysis by looking to the broad purposes of the Voting Rights Act. *Id.* at 204. He observed that the Court had noted in the past that Congress intended Section 5 to have "'the broadest possible scope' reaching 'any state enactment which altered the election law of a covered State in even a minor way.'" *Id.* (quoting *Allen*, 393 U.S. at 566-67). As the Court had previously stated, Section 5 "'applies to all entities having power over any aspect of the electoral process within designated jurisdictions, not only to counties or to whatever units of state government perform the function of registering voters.'" *Id.* (quoting *Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. at 118).

Finally, Justice Stevens considered the history that led to the enactment of the Voting Rights Act, noting that Congress determined that it needed to act prospectively to eradicate discrimination because a case-by-case approach was ineffective. *Id.* at 211, 213. In particular, even though the Supreme Court had struck down several discriminatory practices, the state of Texas and its political parties still sought to circumvent those decisions, leading to the Court's further decisions in the White Primary Cases. *Id.* at 211-13 (citing *Nixon v. Herndon*, 273 U.S. 536 (1927), *Nixon v. Condon*, 286 U.S. 73 (1932), *Smith v. Allwright*, 321 U.S. 649 (1944), and *Terry v. Adams*, 345 U.S. 461 (1953)). As Justice Stevens wrote, "[t]he preclearance system of § 5 was designed to end this evasion once and for all." *Id.* at 213. Given that historically the political parties in Texas were the very entities attempting to evade the Supreme Court's mandates, the logical implication was that Congress sought to include political parties within Section 5's ambit. *Id.* at 216.

In formulating an "operative test," Justice Stevens explained that

[t]he imposition by an established political party—that is to say, a party authorized by state law to determine the method of selecting

its candidates for elective office and also authorized to have those candidates' names automatically appear atop the general election ballot—of a new prerequisite to voting for the party's nominees is subject to § 5's preclearance requirement.

*Id.* at 219.

Justice Breyer (joined by Justices O'Connor and Souter) concurred in the judgment. *Id.* at 235 (Breyer, J., concurring in the judgment). His opinion highlighted Congress's intent when enacting the Voting Rights Act: "In 1965, to have read this Act as excluding all political party activity would have opened a loophole in the statute the size of a mountain. And everybody knew it." *Id.* He reasoned that Congress could not have intended to create such a loophole. *Id.* at 236-37. Accordingly, he concluded that Section 5 must cover political parties with respect to their nominating conventions. *Id.* at 237.

Justice Breyer would end the analysis there. *Id.* at 238. "We need not go further in determining when party activities are, in effect, substitutes for state nominating primaries because the case before us involves a nominating convention that resembles a primary about as closely as one could imagine." *Id.* He noted that Justice Stevens's opinion did not define the exact boundary of political party rules subject to Section 5 preclearance and that "[f]urther definition should await another day." *Id.* at 240. In particular, Justice Breyer worried about the potential First Amendment implications of requiring political parties to preclear party rules, because the application of Section 5 to all political party activity would impinge upon the party's associational rights. *Id.* at 239. However, construing Congress's intent as including coverage of political parties when the parties nominated their candidates pursuant to the State's delegation of authority—thereby avoiding a large loophole in the Act—did not present those significant First Amendment concerns. *Id.*

Justice Scalia (joined by Justice Thomas) dissented. *Id.* at 241 (Scalia, J., dissenting). He focused his dissent on the "weighty" First Amendment question

regarding the political party's freedom of political association. *Id.* He concluded that requiring a political party to preclear its rules amounted to a "classic prior restraint." *Id.* at 243-44. He believed that the majority's decision would cause party officials to abstain from conducting some convention activities instead of seeking preclearance. *Id.* at 243. He also predicted that the Court's decision would require parties to preclear virtually every decision pertaining to their internal operations. *Id.* at 245.

Justice Kennedy (joined by Chief Justice Rehnquist) also dissented. *Id.* at 247 (Kennedy, J., dissenting). He used his dissent to analyze the plain meaning of Section 5. *Id.* at 248. He concluded that Section 5, by its very language, does not reach "all entities or individuals who might be considered the State for constitutional purposes." *Id.* He stated that Congress could have covered political parties or other actors if it had wanted to but instead chose to include only states and their political subdivisions within the scope of Section 5. *Id.* at 250. Given the obvious absence of political parties from the statutory text, Justice Kennedy asserted that the Court should not interpret the Act in a manner that raises difficult First Amendment concerns. *Id.* at 251.

Finally, Justice Thomas (joined by Chief Justice Rehnquist, Justice Scalia, and Justice Kennedy in part) issued the main dissent in the case. *Id.* at 253 (Thomas, J., dissenting). He first focused on the text of the Act, stating that "[t]he ordinary meaning of the word 'State' does not encompass a partisan group such as the Republican Party of Virginia." *Id.* at 254. He therefore rejected Justice Stevens's reliance on the Attorney General's regulation, arguing that the Court should give the regulation no deference because Section 5 unambiguously covers only states or their political subdivisions, not political parties. *Id.* at 258. Justice Thomas also took up Justice Scalia's First Amendment argument, concluding that the majority's construction of Section 5 violates the rights of the Republican Party and its members to freedom of political association. *Id.* at 283.

He noted that the registration fee was simply the Republican Party's method of funding its convention, which is a constitutionally protected choice. *Id.* at 284. Justice Thomas also echoed Justice Scalia's prior restraint argument. The solution to this constitutional infirmity, according to Justice Thomas, was to exclude political parties from Section 5's reach. *Id.* at 285.

In sum, five Justices in *Morse* agreed that Section 5 required the Republican Party to preclear its new rule imposing a registration fee on participants in its nominating convention. Although there was no single majority opinion defining exactly which political party rules fall within Section 5's ambit, five Justices determined that a political party must preclear rules that affect the voting process when the state delegates authority to the party and there are no significant First Amendment concerns. Contrary to the TDP's contention, neither Justice Stevens's controlling opinion nor Justice Breyer's concurrence confined the Court's decision to a political party rule that is tantamount to a poll tax. Additionally, both Justice Stevens's and Justice Breyer's opinions rejected the dissenters' argument that First Amendment concerns counseled against a ruling that Section 5 covers certain political party rules.

Only one other court has examined *Morse* in any detail. In *LaRouche v. Fowler*, 77 F. Supp. 2d 80 (D.D.C. 1999), a three-judge panel of the District Court for the District of Columbia concluded that *Morse* did not require a political party to preclear a rule that specifically kept a particular candidate off of the ballot. Importantly, the facts of *LaRouche* are highly distinguishable from the present case.

Lyndon H. LaRouche, Jr. ("LaRouche") sought to become the 1996 Democratic nominee for President of the United States. *Id.* at 82. In 1994, the Democratic National Convention ("DNC") adopted its rules for the 1996 convention, which included a stipulation that the Democratic nominee had to be

a "bona fide Democrat." *Id.* at 82-83. After LaRouche qualified for a position on the Democratic primary ballot in several states, the Chairman of the DNC sent a letter to the state Democratic parties stipulating that LaRouche was not a "bona fide Democrat" based on his racist and anti-Semitic views, and therefore that the state parties should not allocate any delegates to him. *Id.* at 83. The Democratic parties of several states followed the directive of this letter and did not allocate any delegates to LaRouche even though he received enough votes for representation. *Id.* LaRouche filed suit against the DNC and the state Democratic parties. *Id.*

The court first recounted the Supreme Court's decision in *Morse*, noting that because the Court did not produce a majority opinion of five Justices, it was "difficult to apply [the case] as binding precedent." *Id.* at 84. The court then ruled that the DNC was not subject to Section 5's preclearance requirement, as "a national political party can[not] be delegatee of power from any of its covered political subunits." *Id.* at 85.

The court then turned to the more difficult question of whether the state parties had to preclear their reliance on the DNC's letter. *Id.* at 87. Noting that the Supreme Court in *Morse* held that certain political party nominating rules are subject to Section 5, the court sought to determine "'which party nominating convention practices fall within the scope of the Act.'" *Id.* (quoting *Morse*, 517 U.S. at 238). Wrapped up in this inquiry, the court noted, were the political party's associational rights. *Id.*

The court focused on the rules that LaRouche challenged, specifically, "internal national party rules governing who, as a Democrat, can be a candidate for president." *Id.* at 89. This rule, the court concluded, was the exact type of "core associational right[] of a political party" that implicated the First Amendment. *Id.* Selecting the type of person that represents the party's beliefs to hold the party's banner in the general election is one of the main purposes of

associating oneself with like-minded individuals. *Id.* (citing *Democratic Party of the U.S. v. Wisc. ex rel. La Follette*, 450 U.S. 107, 121-22 & n.22 (1981) (stating that the freedom to associate "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only")). A clash with this type of core associational right is what concerned some of the Justices in *Morse*. *Id.* Unlike a poll tax or registration fee, the decision that a candidate does not represent the views of the party is similar to a rule governing internal operations that Justice Breyer exempted from preclearance in his concurrence in *Morse*. *Id.* (citing *Morse*, 517 U.S. at 238 (Breyer, J., concurring in the judgment)).

Thus, the rule from *LaRouche* is that *Morse* applies only to political party rules that do not affect "core" associational rights and that *Morse* does not extend to an internal party decision that a particular person is anathema to the ideals of the party. As we discuss below, the TDP's delegate allocation formula does not implicate these same kinds of core associational freedoms.[3]

Finally, we note that the Fifth Circuit has assumed, although not explicitly decided, that *Morse* stands for the proposition that "the conduct of party primary elections under the auspices of the State is subject to preclearance under the Voting Rights Act." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 542 n.4 (5th Cir. 2008).

## IV. The TDP's Summary Judgment Motion

With this detailed background of *Morse* in mind, we can now address the precise issues before us. The TDP makes three arguments in support of its

---

[3] The TDP asserts that a second case, *Nelson v. Dean*, 528 F. Supp. 2d 1271 (N.D. Fla. 2007), bolsters its reading of *Morse*. However, *Nelson* never cited *Morse*, and the court's discussion of the Voting Rights Act concerned Section 2, not Section 5. *Id.* at 1281-82. Moreover, *Nelson* included no discussion at all regarding whether the DNC had to preclear its choice not to seat the delegates from Michigan and Florida at the 2008 convention. The TDP's reliance on *Nelson* is therefore wholly misplaced.

motion for summary judgment. First, the TDP claims that the plain text of Section 5 applies only to "political subdivisions," not political parties. Second, the TDP asserts that application of Section 5 would impinge upon its First Amendment rights. Finally, the TDP states that this case is not justiciable. Each of these arguments lacks merit.

## A.    Text of Section 5

The TDP essentially adopts Justice Kennedy's dissent in *Morse*, contending that Section 5, by its plain terms, covers only "states" and their "political subdivisions," not political parties. *See Morse*, 517 U.S. at 248-50 (Kennedy, J., dissenting). As support, the TDP relies upon the fractured nature of the Court's decision in *Morse* and the decision in *LaRouche*. However, the TDP's argument fails because its view was the *minority* view in *Morse*. Even though there was no opinion that garnered five votes, five Justices rejected the dissent's plain text reading of the statute. Both Justice Stevens's and Justice Breyer's opinions concluded—albeit for slightly different reasons—that Section 5 covers certain activities of political parties even though the language of the statute does not explicitly mention "political parties." *Morse*, 517 U.S. at 205 (opinion of Justice Stevens); *id.* at 237 (Breyer, J., concurring in the judgment); *see also* Ellen Katz, *Withdrawal: The Roberts Court and the Retreat from Election Law*, 93 MINN. L. REV. 1615, 1634 (2009) (discussing how the Rehnquist Court "repeatedly construed Section 5 broadly when confronted with the question whether a change was of the sort for which preclearance was required" and including *Morse* as an example); Michael J. Pitts, *What Will the Life of* Riley v. Kennedy *Mean for Section 5 of the Voting Rights Act?*, 68 MD. L. REV. 481, 514, 516-17 (2009) (explaining how *Morse* falls within the Court's typical practice of providing a "strong procedural rule that Section 5 covers all changes directly related to voting no matter how seemingly insignificant"). The split majority opinion therefore provides the TDP with little room to maneuver, because there

was a five-Justice majority on this point. Similarly, the TDP misconstrues the holding in *LaRouche* when it contends that the court concluded that *Morse* does not require political parties to preclear their rules. Instead, the court in *LaRouche* acknowledged that political parties must preclear certain rules; the court simply found that the rule in question implicated "core associational rights" and therefore was not the type of rule that the majority of Justices in *Morse* envisioned would require preclearance. *LaRouche*, 77 F. Supp. 2d at 89.

Given that the TDP's argument was the dissenting position in *Morse*, its contention that Section 5 never applies to political parties is unavailing. Further, the TDP virtually ignores the Attorney General's regulation that Justice Stevens found so persuasive. *See* 28 C.F.R. § 51.7. As recounted above, that regulation states that Section 5 applies to certain activities of a political party, such as changes with respect to the conduct of primary elections. *Id.* Finally, we note that the Supreme Court recently read the definition of "political subdivision" in the Voting Rights Act *broadly* for the purpose of determining which entities may "bail out" of Section 5's preclearance requirement; from a textual standpoint, a ruling that narrows the exact same definition of "political subdivision" in this case would clash with this guidance. *See Nw. Austin Mun. Utility Dist. No. One*, 129 S. Ct. at 2514. Accordingly, given the judgment in *Morse* (which garnered the votes of five Justices) and the Attorney General's regulation—which received the imprimatur of the controlling opinion—we reject the TDP's argument that Section 5 never applies to political parties.

## B.    First Amendment Associational Rights

The TDP presents a slightly stronger argument when it asserts that requiring it to preclear its party rules violates its right to freedom of association under the First Amendment. The TDP cites a long line of Supreme Court cases affirming the general notion that political parties possess important constitutional rights of association. However, the TDP cites these cases in the

abstract without recognizing that these rights are not absolute. In *New York State Board of Elections v. Lopez Torres*, 128 S. Ct. 791, 797 (2008), the Court recently noted that "[a] political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." The Court acknowledged, however, that these First Amendment rights are "circumscribed . . . when the State gives the party a role in the election process," such as when a state "giv[es] certain parties the right to have their candidates appear with party endorsement on the general-election ballot." *Id.* at 797-98. Thus, the question is not whether political parties have associational freedoms; they most certainly do, and this is not a controversial proposition. Instead, the proper inquiry—as the opinions constituting the majority in *Morse* and the decision in *LaRouche* recognized—is whether requiring preclearance of the particular rule in question impermissibly infringes upon these core associational rights. Put another way, does the rule that the party is seeking to promulgate implicate the party's First Amendment freedoms, or is the rule more akin to an election regulation that impacts voting and touches upon the political party's associational rights only incidentally?

On this score, Plaintiffs point out that the TDP has offered no evidence whatsoever regarding how a requirement that it preclear its delegate allocation formula would affect its freedom to associate under the First Amendment. Instead, the TDP simply relies upon the general notion that requiring it to preclear any of its procedures would violate its First Amendment rights. *Morse* rejects this assertion as a general matter; the TDP therefore must explain what about this particular rule raises First Amendment associational concerns that would exempt it from preclearance.

The TDP has not presented any evidence, however, to suggest that its delegate allocation method is its way of expressing its associational preferences.

Indeed, it might be that the TDP adopted this methodology for administrative ease or for some other benign purpose that does not impact its First Amendment rights. Moreover, even if the delegate allocation plan affects the party's freedom of association, there is also a component of the plan that is simply about electoral practices. *See* 28 C.F.R. § 51.7 (noting that political parties must preclear "[c]hanges with respect to the conduct of primary elections at which party nominees, delegates to party conventions, or party officials are chosen").

In fact, in promulgating a rule that affects representation and voting strength of citizens living in various districts within Texas, the TDP is acting under the state's authority. Just as in *Morse*, which involved Virginia law, Texas law ensures ballot access to the winning candidate of a nominating convention. Section 181.002 of the Texas Election Code provides, "A political party may make nomination for the general election for state and county officers by convention, as provided by this chapter, if the party is authorized by Section 172.002 to make nominations by primary election." TEX. ELEC. CODE ANN. § 181.002.[4] A political party that intends to nominate its candidates through a convention must register with the Texas Secretary of State. *Id.* § 181.0041. Texas law expressly stipulates that the party's nominees will appear on the general election ballot:

> (a) To be entitled to have the names of its nominees placed on the general election ballot, a political party required to make nominations by convention must file with the secretary of state, not later than the 75th day after the date of the precinct conventions held under this chapter, lists of precinct convention participants indicating that the number of participants equals at least one percent of the total number of votes received by all candidates for governor in the most recent gubernatorial general election. The lists must include each participant's residence address and voter

---

[4] TEX. ELEC. CODE ANN. § 172.002 provides the general criteria for a political party to hold a primary.

registration number.

> (b) A political party is entitled to have the names of its nominees placed on the ballot, without qualifying under Subsection (a), in each subsequent general election following a general election in which the party had a nominee for a statewide office who received a number of votes equal to at least five percent of the total number of votes received by all candidates for that office.

*Id.* § 181.005. The Texas Election Code also provides detailed mandates for conducting a nominating convention. For example, the statute stipulates when the conventions must occur, *id.* § 181.061, requires particular notice of the hour and place of a convention, *id.* § 181.064, and states that only registered voters of the precinct may participate in the convention, *id.* § 181.065. Importantly, Texas law also grants authority for the political parties to determine the number of delegates to be selected at the conventions:

> A political party shall provide by rule for the number of delegates to be selected at the precinct conventions for the county conventions and the number of delegates to be selected at the county conventions for the district conventions and the state convention held under this chapter.

*Id.* § 181.062.

Thus, the TDP's delegate allocation system is a rule that "affects" voting promulgated under the authority of state law, which guarantees ballot access to the winner. *See Morse*, 517 U.S. at 227. It is also a practice that generates "[c]hanges with respect to the conduct of [nominating conventions] at which party nominees, delegates to party conventions, or party officials are chosen," which requires preclearance according to the Attorney General's regulation. 28 C.F.R. § 51.7.[5] This case thus falls squarely under *Morse*, and there are no

---

[5] Although the Attorney General's regulation speaks to "primary elections," there is no relevant distinction for this analysis between primaries and nominating conventions under Texas law. *See Morse*, 517 U.S. at 200-01 (noting that there is no distinction under the Attorney General's regulation between a primary election and a nominating convention).

constitutional concerns because the delegate allocation rule primarily involves electoral practices and has only a tangential effect on the party's associational rights.

The TDP simply generalizes that applying Section 5 would violate its rights as a political party, but this general argument is unavailing in light of *Morse*. The proper inquiry is whether requiring preclearance *for this particular rule* would cause constitutional problems because the rule itself impacts the Party's associational freedoms. The TDP failed to explain, in either its summary judgment motion or in response to our direct questioning at the hearing, how preclearing this particular rule would implicate its First Amendment rights. Moreover, just as in *Morse*, Texas law expressly authorizes the TDP to determine its delegate allocation method and guarantees ballot access for the winner. Thus, *Morse* applies, and we must reject the TDP's First Amendment argument.

## C.    Justiciability

The TDP also fails to show that this case is nonjusticiable.

Judge Posner explained the justiciability doctrine as follows:

> The concept of justiciability is designed to confine the federal courts to the traditional core judicial functions of Anglo-American judiciaries. So when there is no "case" in that traditional sense, because of mootness, lack of adversity, lack of standing in the sense either that the plaintiff has suffered no injury from the defendant's alleged wrongdoing or the court cannot grant relief that will confer a benefit on the plaintiff, lack of any law to apply (as when the court is asked to decide a "political question" in the sense of a question that lies outside judicial competence because of lack of judicially administrable standards or an unwillingness to "take on" a coequal branch of government in sensitive areas such as foreign relations), the suit will be dismissed as nonjusticiable.

*Smith v. Boyle*, 144 F.3d 1060, 1063 (7th Cir. 1998) (citing cases).

The TDP asserts that we should not interject ourselves into the delegate

selection rules of a political party. According to the TDP, the party membership votes on party rules like how to allocate delegates among the districts, making the delegate allocation formula a product of the democratic process that occurs at the party's conventions. In essence, although it speaks in broad terms about justiciability, the TDP is really asserting that the current controversy falls under the political question doctrine. It would follow that this intra-party dispute is nonjusticiable.

Importantly, the cases that the TDP cites to support its argument each involved a *constitutional* challenge, not a claim that the party must preclear voting changes under the Voting Rights Act. *See O'Brien v. Brown*, 409 U.S. 1, 2 (1972) (per curiam); *see also Cousins v. Wigoda*, 419 U.S. 477, 482 (1975); *Wymbs v. Republican State Executive Comm.*, 719 F.2d 1072, 1083 (11th Cir. 1983); *Ripon Soc'y v. Nat'l Republican Party*, 525 F.2d 567, 578 (D.C. Cir. 1975) (en banc) (explicitly declining to decide whether a constitutional challenge to a political party's allocation of convention delegates was justiciable). Justiciability in the voting rights context typically involves the question of whether there is a judicially manageable standard to review the constitutional question. *See Vieth v. Jubelirer*, 541 U.S. 267, 281 (2004) (finding that claims of partisan gerrymandering are nonjusticiable because there are "no judicially discernible and manageable standards for adjudicating" these disputes). In fact, the main case on which the TDP relies in asserting that political parties do not fall within the scope of Section 5 actually *rejects* a justiciability argument. In *LaRouche*, the D.C. Circuit (before remanding to the three-judge panel for an analysis of *Morse*) noted that the party incorrectly based its argument upon on the same Supreme Court precedents that the TDP raises here. *See LaRouche v. Fowler*, 152 F.3d 974, 981 (D.C. Cir. 1998). The court explained,

> Although it may be difficult to determine whether [the political party's delegate selection rule] comes within the Act's terms, courts

do not lack judicially discoverable and manageable standards for making that determination. The application of the Voting Rights Act's language to the facts of the Party's delegate-selection rules is a typical judicial exercise.

*Id.*

The Supreme Court has not discussed justiciability in the context of Section 5, but it has rejected the argument that certain disputes under Section 2 of the Voting Rights Act are nonjusticiable:

The statute was enacted to protect voting rights that are not adequately protected by the Constitution itself. The standard that should be applied in litigation under § 2 is not at issue here. Even if serious problems lie ahead in applying the "totality of circumstances" standard described in § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress.

*Chisom v. Roemer*, 501 U.S. 380, 402-03 (1991) (citation and footnote omitted). The Court also determined in *Morse* that the Republican Party had to preclear its convention fee without ever mentioning any justiciability or political question concerns. Similarly, the Fifth Circuit's instructions to this three-judge panel explain the exact questions we must answer to determine if the TDP's delegate allocation plan requires preclearance, and the Fifth Circuit obviously did not believe that these questions presented nonjusticiable issues. Accordingly, we reject the TDP's argument.

## V. Conclusion

As recounted above, the Fifth Circuit directed this panel to resolve three questions. *See LULAC*, 318 F. App'x at 263. Today, we determine that the TDP is a "political subdivision" with respect to its delegate allocation formula, thereby resolving the third question. At the summary judgment hearing, the TDP expressly conceded that its method is a "change" to its baseline practice, thus answering the second question in Plaintiffs' favor. As to the first

question—whether the delegate allocation method is a "standard, practice, or procedure with respect to voting within the meaning of § 5"—we note our initial skepticism with any opposition from the TDP on this point. *See Dougherty County, Ga., Bd. of Educ. v. White*, 439 U.S. 32, 37-40 (1978) (discussing the Supreme Court's consistently broad interpretation of this phrase); *Allen*, 393 U.S. at 566 ("Congress intended [Section 5] to reach any state enactment which altered the election law of a covered State in even a minor way."). Indeed, political expediency and the TDP's stated support for Section 5 might counsel it now to seek preclearance of its delegate allocation rules instead of proceeding further in this litigation. Nevertheless, because the first question is not yet squarely before us, we will withhold judgment and invite cross-motions for summary judgment on this issue should the parties not be able to resolve this remaining dispute on their own.

Our decision does not mean that political parties must preclear every minute change in their operating procedures. Instead, we closely follow *Morse* in concluding that political parties must seek preclearance for a change that affects voting that the party promulgates under the explicit or implicit authority of a covered jurisdiction and that presents no significant First Amendment concerns. We therefore hold that *Morse* controls, that the TDP has provided no specific explanation as to how a requirement that it preclear its delegate allocation formula impacts its associational freedoms, and that this case is justiciable. Accordingly, we DENY the TDP's motion for summary judgment.

SIGNED this 24th day of August, 2009.

_____
Edward C. Prado
United States Circuit Judge

Fred Biery
United States District Judge

Xavier Rodriguez
United States District Judge

BIERY, District Judge, concurring:

Because the summary judgment standard of review favors the non-movant and because the various opinions and phrases in *Morse* can, and have been, used by both sides to support their position, I concur with the letter of the law result and analysis.

Clearly, political parties can devise delegate selection processes so long as a level playing field is provided for all who choose to vote. There are no allegations here of intimidation, poll taxes or literacy tests, the historical evils which made the Voting Rights Act necessary.

Though this Court has no ability to address issues other than whether Section 5 applies to a political party's delegate allocation formula, and as this matter proceeds further through the Executive branch and judicial levels, clarification of *Morse*, *Northwest Austin*, and Executive branch regulations would give guidance to lower courts and political parties in situations where party rules are neutral but the failure to vote produces a delegate allocation shortfall to the detriment of groups who choose not to exercise the right protected by the Voting Rights Act.

Fred Biery
United States District Judge